AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Eastern District of Kentucky

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>607 Boonesboro Avenue, Lexington, Kentucky 40508,<br>2010 Honda Civic, KY License Plate 5112HJ, Zachary<br>Knight DOB: 7/24/79 (See Attachment A,B) | )<br>)<br>)<br>)<br>)<br>) Case No. 22-MJ-5106-MAS |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

607 Boonesboro Avenue, Lexington, Kentucky 40508; 2010 Honda Civic (silver), KY License Plate 5112HJ; Zachary Albert Knight, White Male, DOB: 7/24/79 (See Attachment A, B for full description)

located in the _____ Eastern _____ District of _____ Kentucky _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, which is incorporated and made a part hereof.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2422(b) | Attempted Enticement of Minor to Engage in Criminal Sexual Conduct |
| 18 U.S.C. 2251(a) | Attempted Production of Child Pornography |
| 18 U.S.C. 2252(a)(2); (a)(4)(B) | Receipt/Distribution and Possession of Child Pornography |

The application is based on these facts:

See Attached Affidavit of Special Agent David Griffith, which is incorporated by reference and made a part hereof

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Jeffrey Tyler Chelf
*Applicant's signature*

Jeffrey Tyler Chelf, TFO FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 03/15/2022 _____

*Judge's signature*

City and state: Lexington, Kentucky

Matthew A. Stinnett, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jeffrey Tyler Chelf, a Task Force Officer of the Federal Bureau of

Investigation, having been first duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 607 Boonesboro

Avenue, Lexington, Kentucky 40508, which is in Fayette County, which is in the Eastern District

of Kentucky, hereinafter referred to as "PREMISES," further described in Attachment A, for the

things described in Attachment B.  The location and items to be searched are described in the

following paragraphs and in Attachment A.  This affidavit is made in support of an application

for a search warrant under 18 U.S.C. § 2422(b), 18 U.S.C. § 2251(a), 18 U.S.C. § 2252(a)(2) and

18 U.S.C. § 2252(a)(4)(B) further described in Section I of Attachment B.  Upon receipt of the

items described in Paragraph 1 of Attachment B, government authorized persons will review

those items to locate the information described in the remainder of Attachment B.

2.      I am a Task Force Officer with the FBI and have been since May of 2021.  As

such, I am a federal law enforcement officer authorized to investigate violations of federal law

and to apply for and execute warrants issued under the authority of the United States.  I

investigate various federal crimes, including those involving child sexual abuse material and

child exploitation.  Prior to joining the FBI as a Task Force Officer, I have been assigned to the

Bureau of Investigation, Special Victims Section, of the Lexington Police Department as a

detective, since January of 2018. As a Lexington Police detective, I am currently assigned to the

Crimes Against Children Unit and specifically investigate internet crimes against children. I am

also a member of the Kentucky Internet Crimes Against Children Task Force, which is headed

by the Kentucky State Police, and made up of several local affiliate agencies. Prior to my assignment as a Crimes Against Children detective with the Lexington Police Department, I was assigned to the Domestic Violence and Sexual Assault Unit of the Special Victims Section, where I investigated crimes involving domestic violence, adult sexual assaults, elder abuse, and human trafficking. Prior to this assignment, I was assigned to the Bureau of Patrol of the Lexington Police Department, since March of 2015. Prior to this assignment, I attended the Lexington Police Department Training Academy, where I began my law enforcement career in 2014.  I have extensive law enforcement training in child exploitation crimes, and most of my caseload consists of child exploitation crimes involving the internet and computer equipment.  I have attended numerous in-services, trainings, and have completed on-line training in relation to computer crimes against children and computer crimes in general.

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.    I am investigating the criminal activities of Zachary Albert Knight. Based upon the information obtained in the investigation and as set forth below, Knight lives at 607 Boonesboro Avenue in Lexington, Fayette County, Kentucky, which is in the Eastern District of Kentucky. Based upon the investigation and as stated below, it is believed that Knight's mother, Edna Mary Knight, resides with Knight at the residence. As will be shown below, I submit there is probable cause to believe that Knight has attempted to entice a minor to engage in sexual activity, attempted to produce child pornography, and has possessed, received, and distributed child pornography, in violation of 18 U.S.C. §§ 2422(b), 2251(a), 2252(a)(2), and 2252(a)(4)(B).

## STATUTORY AUTHORITY

5.    This investigation concerns alleged violations of Title 18, United States Code, §§ 2422(b), 2251(a), 2252(a)(2), and 2252(a)(4)(B), relating to enticement of minors and material involving the sexual exploitation of minors:

a.   18 U.S.C. § 2422(b) prohibits a person from using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, to knowingly persuade, induce, entice, or coerce any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempt to do so.

b.   18 U.S. C. § 2251(a) prohibits a person from employing, using, persuading, inducing, enticing, or coercing any minor to engage in, or to have a minor assist any other person to engage in, or to transport any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

c.   18 U.S.C. § 2252(a)(2) prohibits a person from knowingly receiving or distributing any visual depiction using any means or facility of interstate or foreign commerce or that has been mailed, or that has been shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails, if (i) the producing of such visual depiction involves the use of a minor engaged in sexually explicit conduct; and (ii) such visual depiction is of such conduct.

d.   18 U.S.C. §2252(a)(4)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any material that contains a visual depiction of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct, that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

6.    The following definitions apply to this Affidavit and its Attachments:

a.    The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

b.    The term "sexually explicit conduct," 18 U.S.C. § 2256(2)(A)(i-v), is defined as actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic areas of any person.

c.    The term "visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

d.    The term "computer," as defined in 18 U.S.C. §1030(e)(1), means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

e.    "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users.  A web server, for example, is a computer which hosts the data associated with a website.  That web server receives requests from a user and delivers information from the server to the user's computer via the Internet.  A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

f.    "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory

4

storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h. "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i. "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

j. "Digital camera" can be a standalone camera or be embedded into a Smartphone. This device records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

k. "GPS" is a navigation device that uses the Global Positioning System (generally abbreviated "GPS") to display its current location. A GPS can either be a standalone device or it can be embedded into a Smartphone. It often contains

records of the locations where it has been. Some GPS navigation devices can give a user directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

l.  The term "child pornography," as defined in 18 U.S.C. § 2256(8), means any visual depiction, including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct. This is also referred to as child sexual abuse material.

m.  The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), SD cards, MicroSD cards, memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

n.  The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

o. "Internet Service Providers" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

p. "Internet Protocol address" (IP address), as used herein, is a code made up of numbers separated by dots that identifies a particular computer on the Internet. Every computer requires an IP address to connect to the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are listed in one of two formats: "IPv4", which is the older version of IP addresses, and IPv6, which is the newer version of IP addresses.

q. "Domain names" are common, easy to remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period.

r. "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

s. The term "Social Networking Site" is used to describe applications or websites which focus on establishing networks or relationships among individual users based on interests or activities.

t. "Portable media player: is either a handheld digital storage device ("MP3 Player" or iPod for example) or an application embedded in a Smartphone, which is designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts

7

of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

u.  "Smartphone" means a combination of a mobile phone / cellphone and a handheld computer that works off mobile networks and/or Wi-Fi, or a wireless connection. A smartphone can do everything a personal computer can do, and because of its mobility, sometimes more. A smartphone is a mobile phone with highly advanced features. A typical smartphone has a high-resolution touch screen display, Wi-Fi connectivity, Web browsing capabilities, and the ability to accept sophisticated applications. Most of these devices run on two popular mobile operating systems, Android or iOS. Almost all smartphones now run on processors with high processing speeds coupled with low power consumptions. That means they allow you to play games, browse the Web, update your social media accounts (i.e. Facebook, Instagram, Twitter), make phone calls, send/receive text messages, take pictures, make videos, and even compose word documents directly on the device. A smartphone is always generally with reach. Like with a traditional computer, smartphones have the ability to download and run hundreds of thousands of mobile applications.

v.  "Tablet" means a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

w.  Wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading

information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW AND/OR RECEIVE CHILD SEXUAL ABUSE MATERIAL

7.     Based on my previous investigative experience related to child sexual abuse material investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who utilize chat rooms, instant messaging apps, and social media sites to target minors for the purpose of obtaining, through various means, images of child sexual abuse material:

a.     Individuals who access with intent to view and/or receive child sexual abuse material may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.     Individuals who access with intent to view and/or receive child sexual abuse material may collect sexually explicit or suggestive materials, in a variety of media, including photographs, digital images and videos, magazines, motion pictures, books, and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts or to refresh their memories of prior sexual child abuse activities they have committed.

c.     Individuals who access with intent to view and/or receive child sexual abuse material almost always possess and maintain their original copies of child pornographic material, that is, their pictures and videos in the privacy and security of their home, person, vehicle, workplace, or some other secure, web-based or cloud-based, location.  Individuals who have a sexual interest in children or images of children typically retain pictures, videos, films, photographs, magazines, correspondence, books, mailing lists, and child erotica for many years. Many of these collections can be found on external media storage devices that are easily concealed in the home, a vehicle, or the workplace, away from family members or co-workers who could stumble upon the collection.

d.      Likewise, individuals who access with intent to view and/or receive child

9

sexual abuse material often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer, web-based program, cloud-based program, or secure third-party application on a mobile device or computer. These collections are often maintained for several years and are kept close by. Physically they can be kept at the collector's residence, a storage building(s) or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly. Digitally they are kept on the device(s) the individual has on their person the most, or a device only they know the password to. Many traders and collectors of child sexual abuse material will ensure their collection, or at least part of their collection, is in a location they have frequent or easy access to and maintain "eyes on" the collection at all times. In your affiant's training and experience, collectors of child sexual abuse material will either have a location in their residence, in their personal vehicles, or at work, where they maintain their non-cloud-based collection.

e.      Individuals who access with intent to view and/or receive child sexual abuse material also may correspond with and/or meet others to share or trade information and materials. They rarely destroy correspondence from other child sexual abuse material distributors/collectors. They conceal such correspondence as they do their sexually explicit material. They often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child sexual abuse material. Sometimes these lists are kept physically, but in more and more cases, the lists are maintained on a mobile or electronic device, or within an application or web-based program (like a friends list on a social media application).

f.      Individuals who access with intent to view and/or receive child sexual abuse material also can, and will, maintain a separate mobile device for their collection, storage, and correspondence regarding child sexual abuse material. These devices are usually kept hidden from family members, partners, and co-workers, in locations either only the collector has access to, or location others have limited access to (for example, an outbuilding, workshop, file cabinet drawer, vehicle if each member of the family has their own, or locked safe). These locations can also be storage locations for any external devices (mentioned above) that may contain a collection.

g.      Individuals who access with intent to view and/or receive child sexual abuse material prefer not to be without their child sexual abuse material for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child sexual abuse material throughout the world.

## BACKGROUND ON COMPUTERS AND CHILD SEXUAL ABUSE MATERIAL

8.      I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience and knowledge, I know the following:

10

9.    Computers and digital technology have dramatically changed the way in which individuals interested in child sexual abuse material interact with each other.  Computers basically serve four functions in connection with child sexual abuse material:  production, communication, distribution, and storage.

10.    In the past, technology for the transfer of child sexual abuse material images consisted of child pornographers' transferring printed photographs into a computer-readable format with a device known as a scanner.  Now, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer.  In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper.  Photos taken on a digital camera are either stored on a removable memory card in the camera, which store up to, or even over, 64 gigabytes of data, equivalent to hundreds of thousands of high-resolution photographs, or the camera is Bluetooth or Wi-Fi capable so the images can be transferred directly to another device, or directly into a social media account on the internet.  Video camcorders, which once recorded video onto tapes or mini-CDs, are now just video cameras that can save video footage in a digital format directly to a hard drive embedded in the camera, or onto a transferable media storage device like a SD card. Some video cameras now even have Bluetooth or Wi-Fi capabilities so they can transfer the image directly to another device, or directly into a social media account on the internet.  For the old camcorders, the video files can be easily transferred from the camcorder to a computer via a cable that comes with the camcorder.  Now, all Smartphones come with a digital camera embedded into the device itself.  The resolution on some of the embedded cameras on Smartphones can be of a higher resolution than portable digital cameras.  The digital camera

11

embedded in a Smartphone can save the image directly onto the device, into a specific folder on the device, to a third-party application installed on the Smartphone, to a media storage card inserted into the Smartphone, or the image can be directed to transmit to an external device via wireless or Bluetooth connectivity between the Smartphone and the selected external device.

11.     A device known as a modem allows any computer to connect to another computer through a telephone, cable, or wireless connection (Wi-Fi).  Electronic contact can be made to literally millions of computers around the world.  The ability to produce child sexual abuse material easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child sexual abuse material.  Child sexual abuse material can be transferred via electronic mail, through file transfer protocols (FTPs), through Peer-to Peer software, and through social media applications, to anyone with access to a computer, laptop, tablet, Smartphone, and a modem.  Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging", "Direct Messaging", cloud-based messaging services, etc.), social media sites, free applications for Smartphones and tablets, all with easy access to the Internet, the computer, laptop, tablet, and Smartphone is a preferred method of production, distribution and receipt of child sexual abuse materials.

12.     The computer's, laptop's, tablet's, and Smartphone's ability to store images in digital form makes these devices themselves an ideal repository for child sexual abuse material. The size of the electronic storage media (commonly referred to as the hard drive) used in all forms of electronics has grown tremendously within the last several years.  These drives can store hundreds of thousands of images at very high resolution.  In addition, there are numerous options available for the storage of computer or digital files.  One, two, and even four-Terabyte

external and internal hard drives are not uncommon in today's computers and laptops. Other media storage devices include CDs, DVDs, "thumb," "jump," or "flash" drives, and external hard drives, which are very small devices that are plugged into a port on the computer, smartphone, laptop, or tablet. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, smartphone, laptop, and tablet, and then copy it (or any other files on the device) to any one of those media storage devices. Media storage devices are constantly being made smaller and smaller in size, and also being made to look like everyday items, that they can easily be concealed and carried on an individual's person (like on a key ring, in a purse or wallet, or on a belt buckle).

13. The Internet affords individuals several different venues for obtaining, viewing, and trading child sexual abuse material in a relatively secure and anonymous fashion, including the traditional "Web" and the "Dark Web" or Tor browsers.

14. Individuals also use online resources to retrieve and store child sexual abuse material, including services offered by Internet Portals such as Yahoo!, Google, and Hotmail, among others, as well as third-party cloud-based storage applications like Dropbox and Vault. The online services allow a user to set up an account with a remote computing service that provides e-mail services, direct messaging, as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child sexual abuse material can be found on the user's computer, smartphone, laptop, tablet, or external media in most cases. All Smartphones now come with the option to have the phone's data systematically updated to a provider's cloud storage. All iPhones can back up a phone's data to iCloud Storage and all Android phones can back up the phone's data to Google Cloud Storage.

This automatic backup also can back up some third-party applications. But most third-party applications, once installed on a mobile device, will keep the individual's contents on one of their own servers, located elsewhere. Some third-party applications allow for special storage on the user's device through their application. While the third-party application can see there is data, the data is encrypted on the application's servers and can only be viewed on the user's device through a special portal or passcode.

15.     As is the case with most digital technology, communications by way of electronic device can be saved or stored on the device used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## **BACKGROUND OF FACEBOOK**

16.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

17.     Facebook asks users to provide basic contact information to Facebook, either during the registration process or thereafter. This information may include the user's full name,

14

birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

18.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook. Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s) as they interact with the Facebook service on those device(s).

19.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

20.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their

whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall" or "Timeline," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

21.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photograph or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photograph or video. When a user is tagged in a photograph or video, he or she receives a notification of the tag and a link to see the photograph or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

22.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. Facebook has a Chat feature, known as Facebook Messenger, which allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat

16

history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

23.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

24.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

25.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

26.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

27.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook

17

profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

28.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

29.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.

30.    Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (lP)

18

addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo- location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

31.    On or about October 13, 2021, the Federal Bureau of Investigation ("FBI"), Louisville Division, received information from FBI Richmond Virginia Division regarding a subject in the Eastern District of Kentucky that was involved in the attempted enticement of a minor and attempted production of child sexual abuse material. Further investigation by both divisions revealed that the subject was also involved in the receipt, distribution and possession of child sexual abuse material.

32.    FBI Richmond Virginia Division had been investigating a subject named ███ █████████████, who was on supervised release with United States Probation in the Eastern

19

District of Virginia as a result of a past conviction on ██████ 2011, for violation of 18 U.S.C. § 2252A(a)(2), Receipt of Child Pornography. That investigation revealed that in 2021, ██████ possessed a nude image of a minor victim, V1 (MINOR – PROTECTED IDENTITY, Date of Birth XX/XX/2007), in violation of his supervised release. ██████ was in a romantic relationship with V1's mother, ███. On August 2, 2021, ██████████ Sheriff's Office (Virginia) and FBI Special Agent Mary Echols executed a search warrant at ████'s residence in ██████████, Virginia. Following the execution of the warrant, SA Echols interviewed ████. ███ is the mother of four minor children, two of which are V1 and V2 (MINOR-PROTECTED IDENTITY, Date of Birth XX/XX/2009), currently ages 14 and 13, respectively. V3 (MINOR-PROTECTED IDENTITY, Date of Birth XX/XX/2009), was also living with ████ during relevant times during this investigation. V3 is currently 12 years old.

33.     During the interview, ████ advised SA Echols that another man had requested nude images of her daughter V1.  Specifically, ████ stated Zach Knight (Knight) had also requested nude images of V1 and engaged in sexual conversations with ████ about V1. ████ reported that she knows Knight because she worked with him from ████ to ████ when he was her boss. Both have since been fired from that employment, but have kept in touch. During communications with ████, Knight asked if ████'s minor daughters masturbate and offered to teach them sex education. Knight sent ████ inappropriate items in the mail for ████'s minor daughters, to include lingerie and sex toys. Knight asked ████ to take pictures of her minor daughter wearing lingerie. Knight also asked for ████'s minor daughter to use sex toys.

34.     Pursuant to a state search warrant, SA Echols extracted data from ████.'s cellular telephone and recovered Facebook messages between Facebook display name ████ (redacted), User ID XXXXX████ (full Number known but redacted), and the Zachary Knight Facebook

account (User ID 100037957242656 and display name "Zach Knight"). The Facebook account with display name ███ is believed to belong to ███ because it was the account associated with her cellphone, and her maiden name is the same as the "█" portion of the account name.

35.    The "Zach Knight" account is believed to belong to Knight because the name on the account is his.  Moreover, the contents of the messages between ███ and the account are consistent with ███'s statements to law enforcement during an interview on August 2, 2021, in which she described her prior communications with Knight. An FBI analyst also reviewed the "Zach Knight" account and verified that the profile picture for the account matched Knight's Kentucky Driver's License photo.

36.    SA Echols reviewed the Facebook messages between ███ and Knight and found that between May 1, 2021 and July 26, 2021, Knight repeatedly asked ███ for nude images of V1. Knight specifically asked for images of "pussy pics" of V1, with her shirt off, "topless", wearing lingerie, "of her butt and front", while she bends over, and "full frontal".  During the time of these messages, V1 was 14 years of age.

37.    Knight sent ███ screenshots of lingerie that he wanted to purchase for V1. Knight asked for ███'s address and phone number for shipping purposes. After ███ provided her address and phone number, on May 4, 2021, Knight sent "Ordered." Knight asked ███ to take pictures of V1 wearing the lingerie and send them to him.

38.    Additionally, Knight asked ███ if he could video chat via FaceTime with V1. V1's cellphone was seized and searched pursuant to a state search warrant.  SA Echols reviewed V1's cell phone extraction and found that Knight is listed in V1's cellphone as "Zack Ex Boss." T-Mobile has confirmed that this cellphone number is subscribed to Knight.  SA Echols found data in V1's cell phone indicating FaceTime calls and text messages between V1's cellphone and

21

Knight, including text messages from September 2020 where Knight says "hi again" (indicating that their communications started before September 2020) and asked V1 if she is using a "toy" he sent her in order to have "an orgasm." V1 lives with ███ in ████████ Virginia.

39.     On February 8, 2022, SA Echols applied for a search warrant for records pertaining to the "Zach Knight" Facebook account. The warrant was granted by the United States District Court for the Western District of Virginia. SA Echols subsequently served the warrant on Facebook, Inc.

40.     On February 15, 2022, Facebook, Inc. provided records responsive to the search warrant. SA Echols made these records available to Your Affiant for review.

41.     Beginning on February 23, 2022, Your Affiant began reviewing the Facebook records pertaining to the "Zach Knight" account, in coordination with SA Echols.

**Review of Facebook Messages Between Knight and** ███

42.     Both Your Affiant and SA Echols reviewed a Facebook Messenger thread between Knight and Facebook User ███ (███), Facebook ID XXXXX███, dated April 4, 2020 through November 17, 2021, Facebook thread: ████████. The thread contains over 1,500 pages of conversations between Knight and ███, in which Knight repeatedly asked ███ for images of V1, including nude images and images of V1 wearing underwear and lingerie. Knight asked numerous times if he could text and FaceTime with V1, as well as teach her sex education. Knight also asked ███ numerous times if he could masturbate while V1 was on FaceTime with him. The following are excerpts of the conversations:

43.     On April 4, 2020, V1 is first referenced in the conversation. ███ sent Knight a picture of V1 clothed and Knight calls V1 "a little hottie". ███ told Knight that V1 was 13 years

old. Knight asked ███ if V1 was masturbating and stated, "she's getting a killer body". Knight also asked ███ if the kids have walked in on ███ having sex or masturbating.

44.     On April 11, 2020, Knight asked ███, "Can I text [V1-MINOR-PROTECTED IDENTITY] while you're busy doing other stuff?" Knight asked ███ for V1's phone number. He also asked ███ "Have you told her that I'm going to tutor her?" ███ later sent Knight a clothed picture of V1. Knight responded that V1 was sexy, had nice legs and "probably has nice little titties too".

45.     On April 12, 2020, Knight asked ███ if she would allow V1 to watch Knight and ███ have sex if V1 wanted too. After ███ said yes, Knight asked if ███, "Would you let her join in the foreplay, like oral on me while I ate your pussy?"

46.     On April 13, 2020, Knight asked ███, "Any sexy pics of [V1-MINOR-PROTECTED IDENTITY] today?". Knight asked if ███ can take some pictures of V1 before she goes to sleep. ███ said "Yeah". Knight replied, "That would be great. I would loooove some skinnn". Later, Knight said, "Still want a topless pic, ass, or you know, pussy or all 3!" and "I'd settle for bra and panties. lol". He asked ███ if V1's phone was on and asked if V1 had Skype.

a.  Knight: "Is she awake?"

b.  ███: "Yea"

c.  Knight: "I just got home and I wanna cummm"

d.  Knight: "I need some sexy pics to cum to ██." (redacted)

e.  Knight: "Or Skype, she won't see anything"

f.  Knight: "Unless she wants to, upstairs in private in your room."

g.  Knight: "Maybe you could ft me and invite her upstairs and ask if she wants to watch?"

23

h. ██: "Gimme a few"

Knight sent an image of his hand around his penis and asked ██ "Will you ask if she wants to watch". Knight asked ██ to FaceTime him and have V1 take over the call. Knight continued to ask about FaceTiming with ██ and V1.

47.    On April 14, 2020, while talking about having sex with ██, ██ asked if Knight would leave afterwards. Knight responded, "I'd cuddle you and/or [V1-MINOR PROTECTED IDENTITY] afterwards. :)." Knight later stated, "I wouldn't do it that way with or [V1-MINOR PROTECTED IDENTITY] though. No hair pulling or spanking." He also stated, "I just mean pulling while in doggy May not be ideal for her". He said, "She'd probably enjoy doggystyle though.". ██ replied "It's my favorite, actually". Knight later continued the conversation about pictures of V1. Knight asked for more pictures and requested "skin". ██ talked about having images of V1 from when V1 was 11 or 12. Knight asked if V1 had a nice body then too. ██ sent Knight images of V1 clothed.

a. Knight: "I don't think saying that I want to have sex with your 11 or 12 year old is the same as saying I want to have sex with your 13 year old. No?"

b. Knight: "But that pic could make me cum."

c. ██: "I know 13 is different"

d. ██: "And I fucking love that picture"

e. ██: "Dunno why"

f. Knight: "She's so fucking sexy ██." (redacted)

g. ██: [sends a picture of V1 in a low cut v-neck shirt]

h. Knight: "Like really really sexy."

i. Knight: "Mmmmm"

24

j.  Knight: "More please"

k.  ▮ : "I'm looking"

l.  Knight: "Your daughter is about to make me cummmm"

m.  ▮ : "Leather pants or orange shirt is?"

n.  Knight: "Both. But I like the shirt because I can almost see her titties"

o.  Knight: "And she's straddling something there, or at least I can imagine it."

p.  Knight: "I cropped a pic you send last night so I could see her ass cheek better"

q.  Knight and ▮ continued to discuss the pictures. ▮ sent Knight another picture of V1 clothed but sitting with her legs spread apart. Knight said, "It's almost pussy so that's why I like it" and "I can pretend".

r.  Knight asked ▮ , "Can I see her pussy" referring to V1. Knight continued to ask and ▮ replied, "Not tonight".

s.  Knight: "Even so, would you be able to even get pussy pics?"

t.  Knight: "This conversation is making me hard tho"

u.  ▮ : "I have no idea."

v.  Knight said, "So tomorrow night, if I get home at a reasonable time, can we arrange for me to ft you and you have [V1-MINOR-PROTECTED IDENTITY] come upstairs while I'm masturbating?" and "Just blow my phone up tomorrow with her pictures".

w.  Knight: "I wanna ft [V1-MINOR-PROTECTED IDENTITY] so I can cum before I have to get ready for work!"

x.  Knight asked ▮ if V1 has Skype or Whatsapp. Knight comments "Now naked [V1-MINOR-PROTECTED IDENTITY]?"

25

y.  Knight asked ▓ if V1 had her phone on. He asked ▓ for V1's Skype.

z.  Knight: "What's her Skype address"

aa. ▓ : "I can text [▓.] to tell him to tell her to turn it on" (redacted)

bb. Knight: "Yeah that would be cool."

cc. Knight: "If she's awake."

dd. Knight: "Do you know her Skype address"

ee. ▓ : "I don't"

ff. Knight: "She does have one though?"

gg. ▓ : "▓▓▓▓, maybe?" (redacted)

hh. Knight: "If she wants to would you be ok with me Skyping her tonight?"

ii. ▓ : "Or ▓▓▓▓▓" (redacted)

jj. ▓ : "I'll find out"

kk. Knight: "And would it be ok if I masturbate while talking to her?"

ll. Knight: "Not that she would see"

mm.     ▓ : "I mean if she doesn't see anything I don't even feel like you need
toask. It's up to you."

nn. Knight: "Oh Ok cool."

oo. Knight: "What would she say if she saw"

pp. ▓ : "She doesn't know you very well yet. She'd probably be uncomfortable."

qq. Knight: "Ok I definitely don't want that."

rr. Later, Knight asked for "sexy photos" of V1 and stated, "I wanna cummm" and
"Cum to them I mean".

48.    On April 15, 2020, Knight asked for more pictures of V1:

26

a.  Knight: "Do you have any pictures of her you haven't sent me?"

b.  Knight: "Pleeeaaassee"

c.  ███: "I'm looking"

d.  Knight: "Younger is ok too"

e.  Knight: "I like cumming to her."

f.  Knight: "Is that ok"

g.  ███: "It's up to you"

h.  ███: "lol"

i.  Knight: "Or is it weird"

j.  ███: [Sends a photo of V1 clothed]

k.  Knight: "Mmm yesss"

l.  Knight: "More!"

m.  ███: [Sends a photo of V1's face]

n.  Knight: "But is it ok with you that I like cumming to her"

o.  Knight: "Any more?"

p.  ███ proceeds to send Knight approximately 30 photos of V1 clothed. Some photos depict V1 posing in bikinis.

q.  Knight: "I'm going to get myself hard here"

r.  Knight: "And ready"

s.  Knight: "Half Loaded"

t.  ███ sent Knight approximately 27 images of V1 clothed and Knight stated "I'm going to start masturbating now. :)" and "Cool?". ███ replied with, "That's legit

27

not my call. :)". Knight expressed that he wants ███'s approval for Knight to masturbate to V1.

u.  Knight: "I guess maybe it's because I feel less like a freak knowing that you're ok with me cumming to your daughter."

v.  ███: "I don't think you're a freak, except maybe for talking to me. :)"

w.  Knight: "I think also, that since you're willing to send me pictures and that you know what I'm doing and support my decision to masturbate to her, that it makes me love you a little more."

x.  Knight continued: "I still want to masturbate with her eventually and watch her cum, but that's down the road and also for my eyes only." and "In the mean time, will you send me the underwear and lingerie pics you have of her when you get home tomorrow?".

y.  Knight: "What are the chances of you getting a picture of her in the shower or fresh out before she gets dressed?"

z.  ███: "Unlikely".

aa. He proceeded to discuss with ███ how to get a "candid" photo of V1 in the bathroom. Knight asked ███ if V1 is on board with Knight teaching her sex education.

bb. Knight: "So she knows that I'll be teaching her sex Ed?"

cc. ███: "Yeah"

dd. Knight: "Can I talk to her about it when I text her"

ee. Knight: "Or ask if she's excited about it"

ff. ███: "Yeah"

28

gg. Knight explained the "sex ed" class will be a video class over Skype. ███ informed Knight that V1 knows it will be over video.

hh. Knight: "And that the aim is to educate her about her body and also the role of the penis and its capabilities, erections and cum."

ii. Knight: "She really needs to see that stuff."

jj. Knight: "Don't you agree?"

kk. ███: "I'd rather her learn real stuff than pick up stuff from friends that isn't true"

ll. Knight: "Right"

mm.     Knight: "She'll need to see what cum looks like and how it comes out."

nn. Knight: "And she will definitely want to know how to experiment with herself and that being wet is normal."

oo. Knight: "And how to cum, what to expect, how good it feels, techniques to try, etc."

pp. Knight: "Right?"

qq. Knight: "Will you let her know that a lot of this will be live and her watching me is part of the curriculum?"

rr. Knight continued to ask for pictures of V1 and said he was going to masturbate to pictures of V1. He asked ███ to tell V1 to turn her phone on and text him. Knight asked for V1's Skype name.

49.     On April 18, 2020, Knight asked for more pictures of V1:

a. Knight: "Where are the underwear model pics"

b. ███: "Trying to figure that out"

29

c. ▮ sends four pictures of V1 clothed. One picture is a close up of V1 wearing a tank top but not wearing a bra underneath.

d. Knight "The white tank is nice too"

e. Knight: "I can kinda see her nipples. ❤"

f. Knight: "I like the ass pic too while she's wet. ❤❤"

g. Knight: "Need the underwear shots tho"

h. ▮ sent approximately six photos of V1 clothed.

i. Knight: "Underwear!"

j. ▮: "I'm looking"

k. Knight: "Just send them all!"

l. Knight said the pictures are sexy and stated, "Those pics make me hard but not yet cum worthy. Just precum." Knight requested more revealing photos of V1, specifically of her wearing "Underwear/panties/bra any and all. :)". He also asked if V1 could video chat him that night.

m. Knight suggested, "You should just save all of them to drop box then they're not on a device." and he tell ▮ that he can set up a Dropbox account.

n. Knight told ▮ he wants pictures so he can masturbate.

o. Knight: "So I can cum everywhere"

p. Knight: "Haha"

q. Knight: "I wanna taste myself while seeing [V1-MINOR-PROTECTED IDENTITY]."

r. Knight: "Sooo sooo badly"

s. ▮ told Knight she's sick and he asks her if she wants to watch him

30

masturbate.

    t.   Knight: "Drop me a couple [V1-MINOR-PROTECTED IDENTITY] pics and I'll cummm super quick for you. :)"

    u.   █ sent three photos of V1 clothed.

50.    On April 20, 2020, while discussing having sex with █, Knight asked if V1 could watch and said, "I'll let her mess around with me while you sit on my face and I'm sucking your clit!" Knight asked for more images of V1, including pictures of her "bending over" and "on all 4s, with ass in the air". Knight stated he wanted to "see her ass and down her shirt". He stated, "Wanting some skin so I can cummm!!".

51.    On April 25, 2020, Knight asked █ for "sexy" pictures of V1 in a bra and panties.

    a.   Knight: "Can you have her take some pictures for me and send them?"

    b.   Knight: "Or videos"

    c.   █: "Yeah when they're back in signal"

    d.   Knight: "Like from her phone. Tell her She can send me whatever she wants, naked or otherwise."

    e.   Knight asked █ to show V1 videos of Knight masturbating.

52.    On April 26, 2020, Knight asked if he could text V1 and █ agreed. Knight implied that V1 was not texting him back and asked, "And is there a secret to getting a 14yo to reply to me". Knight asks for pictures of V1 and to video call her. He asked, "Can you take a couple [V1-MINOR-PROTECTED IDENTITY] pics while I'm masturbating please?" and continues "Pleaseee. I just need a few to push me over the edge."

53.    On April 27, 2021, Knight again asked █ about teaching V1 sex education.

31

a.   Knight: "Well I wanna talk to her"

b.   Knight: "Have you told her about the sex Ed tutoring yet?"

c.   Knight: "Or nah"

d.   ██ : "Yeah"

e.   Knight: "Did she like the idea"

f.   ██ : "Yeah"

g.   Knight: "Like she wants me to teach her about sex and masturbation?"

h.   Knight: "Those things specifically were mentioned?"

i.   ██ : "I don't remember exactly what i said"

j.   Knight: "But she's open to masturbating and me teaching her"

k.   ██ : "Yeah"

l.   Knight: "Well that's cool"

m.   Knight: "She knows that she can show me and also that she will see what cum looks like from a guy."

n.   ██ : "Uh huh"

o.   Knight asked ██ , "Well can [V1-MINOR-PROTECTED IDENTITY] cum with me then if you're unable?"

54.   On May 5, 2020, Knight told ██ , "I feel a little pervy blowing up a 13 yo phone. But damn, she should text back." Knight also expressed to ██ , "And I'm ready to start that sex Ed with her this week.". Knight asked if V1 is ready and ██ said yes. Knight said that ██ can be there while he's teaching V1. Knight said he wished V1 was older so it would be ok for him to have sex with both ██ and V1.

a.   Knight: "I wanna have sex with the both of you."

32

b. ███ : "I am all the game"

c. ███ : "Lol"

d. Knight: "For me having sex with both of you?"

e. ███ : "Sure. But legality *sigh*"

f. Knight: "Ugh I know."

g. Knight: "I'd be so gentle"

h. Knight: "Would it still be illegal to eat her? There's no penetration then."

i. ███ : "I have no idea"

j. Knight expressed that he is sexually attracted to V1 and requested more "sexy" pictures of V1 and asked to masturbate. ███ sent four clothed images of V1. Knight responded that they were "hot" and, "I want her to sit on my face while you ride me." Knight then started talking about teaching V1 "sex ed".

k. Knight: "Yeah, poor girl needs to be slowly introduced and assigned homework, in that she needs to cum."

l. Knight: "Right?"

m. ███ : "Yes"

n. Knight: "She also probably needs pointers which is why I want to give her instruction on things to try."

o. Knight: "Need to see how she's doing it and give her active feedback, realtime."

p. Knight suggested V1 staying with him at his home and sleeping with him.

q. Knight: "Hahaha. She can stay as long as we can cuddle and play."

55.    Between May 8 and 9, 2020, Knight asked if it was ok if he masturbated while he and V1 talked:

33

    a.   Knight: "Is it ok if I masturbate while we talk if I don't show her anything and I'm nice?"

    b.   █: "As long as you don't show her"

    c.   Knight: "I won't"

    d.   Knight: "Not this time at least. Maybe once we get into sex ed in the future for educational purposes."

    e.   Knight asks if it's time to video chat. █ and Knight video call (Duration 938). Following the call, Knight says "Thanks again █. (redacted) I know that wasn't easy for you to let me talk to V1.

    f.   Knight told █ that he really wanted to "develop a relationship" with V1 but felt like █ was "cockblocking" him. He further stated he was "attracted to both of you." Knight asked for underwear and topless images of V1 in various positions. █ responded that she would try and Knight asked █ to promise to take pictures of V1. Knight asked █ to give V1 something to suck on in the pictures, like a spoon or a hairbrush handle, or one of █'s sex toys.

    g.   Knight asked █ if she was going to get a sex toy for V1. Knight then suggested █ buy V1 a small sex toy. Knight sent two Amazon links for sex toy vibrators and stated, "She'll want to have one available as a prop for sex ed anyway."

56.   On May 10, 2020, Knight requested more pictures of V1. █ sent Knight clothed images of V1. Knight directed █ to have V1 bend over and take her shorts off.

57.   On May 11, 2020, █ told Knight V1 was "changing and showering." Knight replied, "shower pic!!". █ advised V1 locked the door and Knight replied, "Well then have her send me a picture!"

58.     On May 12, 2020, Knight told ▮▮ that he video chatted with V1 that morning. Knight stated "I got to cum too, but I promise she didn't know."

59.     On May 14, 2020, Knight told ▮▮ that he video chatted with V1 that morning. He asked if V1 wanted to watch he and ▮▮ masturbate together and asked if ▮▮ had ordered the "small toy for [V1-MINOR-PROTECTED IDENTITY].

    a.  Knight: "I'll buy it for her if that's ok"

    b.  Knight: "And just ship it to you"

    c.  Knight: "What's your address"

    d.  ▮▮ : "XXXX, ▮▮▮▮ VA ▮▮" (redacted)

    e.  Knight: "Ok. Should I address it to her or to you"

    f.  ▮▮ : "Me, please"

    g.  Knight: "She might like getting a package"

    h.  ▮▮ : "Her dad might open it"

    i.  Knight: "Ahh ok"

60.     On May 14, 2020, Knight told ▮▮ that he video chatted with V1 that morning and that he was shirtless. Knight expressed that he liked V1 and thought she liked him. He asked ▮▮ if he could send lingerie to V1 and asked what V1's sizes were for bras and panties. Knight then sent ▮▮ seven screenshots of lingerie to ▮▮ ▮▮ and Knight had a Facebook Messenger call ("Duration 423"). Immediately following the call, Knight stated, "The toy should be there by Monday. :)" and He asks ▮▮ to tell V1 it's from him. Knight continued by stating that he'll explain what's it's for to V1. Knight also asks for V1's bra and panty size again. He asked if he could text V1 and ask her what her bra and panty size was. Knight then sent a screenshot of the vibrator sex toy that he ordered for V1.

61.    On May 15, 2020, Knight sent ██ screenshots of a text message conversation between he and V1. In the screenshots, Knight can be seen asking V1 to send a picture of her wearing thongs. V1 did not send the picture. Knight then told ██, "She thinks I'm creepy. :(" and "That makes me sad".

62.    On May 16, 2020, Knight again asked to send lingerie to V1. ██ agreed and Knight sent ██ numerous screenshots of lingerie to ██ Knight later sent ██ another screenshot of an Amazon order. Knight also asked if V1's sister, V2-MINOR-PROTECTED IDENTITY, who was 10 years old at the time, was "too young for sex Ed?", to which ██ responded, "Yeah".

a.  Knight: "That's what I figured but thought maybe [V1-MINOR-PROTECTED IDENTITY] wouldn't feel as uncomfortable if she had a sibling with her. "

b.  Knight: "I hope [V1-MINOR-PROTECTED IDENTITY] will like her toy."

c.  ██ : "I'm sure she will"

d.  Knight later asked, "Aw you going to tell her the toy is from me or you"

e.  ██ : "You"

f.  Knight: "Are you sure that's a good idea"

g.  ██ : "Yea I'm sure"

h.  Knight: "If she thinks I'm creepy that's definitely won't make matters better "

i.  ██ : "She doesn't"

j.  Knight: "But would she after knowing I bought her a sex toy?"

k.  ██ : "No"

l.  Knight: "She definitely doesn't seem to remember that I'm going to be her sex tutor. "

36

    m. Knight suggests that V2 can use the vibrator if V1 doesn't, and stated that V2 will need to know how to use it too.

    n. Knight asked ▇ if she had any "cute" pictures of V2. ▇ sent Knight numerous clothed pictures of V1 and V2. Knight responded, "Oh dayummmm" and "She's damn cute too!"

    o. Knight asked if the girls have ever sent pictures of their "parts" to ▇, and then stated he wanted to see pictures of V1 in underwear and lingerie.

63.     On May 17, 2020, Knight talked with ▇ about ▇ and V1 traveling from Virginia to Kentucky to visit him next week. He discusses making a hotel reservation. He also asked for images of V1 and V2.

    a. Knight: "Send me some sweet and sexy [V1-MINOR-PROTECTED IDENTITY] pictures today!"

    b. Knight: "Totally ok to send me sexy pics of [V2-MINOR-PROTECTED IDENTITY] too. :)"

    c. Knight asked if V2 was too young to wear lingerie. He sent ▇ five pictures of lingerie and asked if V2 would like any of them. Knight then sent ▇ two screenshots of Amazon lingerie purchases that he says he is sending for V1.

    d. Knight tells ▇ that the lingerie will help "reveal [V1's] pussy".

    e. Knight asked if V1 could "watch me cum real quick".

64.     On May 18, 2020, Knight told ▇, "toy and first delivery of lingerie" would be delivered that day. Later that day, Knight said the items were delivered and sent ▇ a screenshot of the Amazon order saying that the items were delivered. ▇ acknowledged receiving the package and sent Knight a picture of V1 wearing the sheer crop top with a bathing

suit top underneath. Knight commented, "She's so fucking hot!" and asked for a picture with nothing underneath the sheer top.

65.    On May 19, 2020, Knight asked ███ if it bothered her that he was attracted to V1 and V2. ███ replied that it didn't bother her.

66.    On May 22, 2020, Knight asked ███, "Can [V1-MINOR-PROTECTED IDENTITY] please please please watch me cum??"

67.    On May 23, 2020, Knight asked ███ if he could text V1 and ask if she wanted watch him "cum".

68.    On May 24, 2020, Knight asked ███ if she gave V1 the vibrator and ███ responded yes. Knight advised he was going to ask V1 if she had used the vibrator yet. Knight later sent ███ screenshots of text message conversations with V1. In the screenshots, Knight can be seen asking V1 if her mom gave her the "long and narrow" "purple" toy that "vibrates". Knight said it was "for private time." Knight then talked with ███ about having sex with her and V1:

   a.  Knight: "Just think, you could sit on my face and cum. Then get off. Then [V1-MINOR-PROTECTED IDENTITY] grinds on my face, cums all over me. Back and forth."

   b.  Knight asks ███ if V1 gets "wet". They discuss if V1 masturbates. Knight then asked to video chat with V1.

   c.  Knight: "Alrighty. I do cum when I talk to her, she just sees nothing at all. Is that ok?"

   d.  Knight: "Or no"

   e.  ███: "Just don't let her see anything"

38

69.     On May 26, 2020, Knight asked ▇ for pictures of V1 in the lingerie with nothing underneath.

70.     On June 2, 2020, Knight asked if he could buy more lingerie for V1, including something that "shows off the pussy area". Knight asked about the chances of seeing V1's "pussy" and asked ▇ "So you're saying that the chances of seeing her pussy are pretty good?". Knight asked to FaceTime with V1. ▇ sent two pictures of V1 in a bikini. Knight commented "Keep it coming! Hot!"

71.     On June 3, 2020, Knight asked for more pictures of V1 and told ▇ "And remember to try and get some pussy pics". Knight asked to FaceTime with V1.

   a.  Knight: "Maybe she can play with her toy with me" and "watch me cum?".

   b.  Knight: "Is it ok with you if she watches me cum"

   c.  Knight: "Will she cum with me?"

   d.  Knight asked ▇ for pictures of V1.

   e.  Knight: "Have you been able to get any pussy pics?"

   f.  Knight: "Or pics from behind with her bent over and legs spread in the lingerie"

   g.  Knight also asked to FaceTime with V1, "Can I FaceTime her really quick so I can cum now. I'm hard and ready. I won't show her". He messaged ▇ "please" several times.

72.     On June 8, 2020, Knight asked ▇ if V1 could get a Snapchat account. Knight asked ▇ for pictures of V1 wearing lingerie.

73.     On June 9, 2020, Knight suggested ███ provide him with her iCloud information so Knight could look at the pictures without her sending them to him. Knight said, ""I really wanna see her buttt".

74.     On June 12, 2020, Knight asked if ███ could take a couple of pictures of V1 bending over against the wall with "nothing underneath". He asked to FaceTime with V1 and suggested, "She can ft me from the shower is she wants. Lol".

75.     On June 30, 2020, Knight asked to FaceTime V1. ███ asked Knight if he was going to turn her in. ███ expressed that she doesn't want to get in trouble and she was scared.

76.     Knight repeatedly asked for more pictures of V1, including pictures of V1 in lingerie, on various dates in July, August, September, October, November, and December 2020, as well as January, February, March, and April 2021.

77.     On October 25, 2020, Knight talked about how he might be visiting Virginia and that he would love to stay with ███ for a day or two. He advised, "I can sleep wherever...couch, your room, [V1's] bed. lol jk jk".

78.     On October 27, 2020, Knight sent ███ a video of himself masturbating and asked ███ if she showed it to V1 and if he can send it to V1.

79.     On multiple dates in March 2021, Knight asks ███ if he can masturbate while FaceTiming with V1.

80.     On March 25, 2021, Knight asked ███ if she had a Dropbox account. He told her it was secure and ███ "could dump your pics there". Knight said he could "share a folder of mine with you and you can add to it." Knight asked for ███'s email address to add her to the folder and ███ provided her email address.

81.     On April 1, 2021, Knight asked for more pictures of V1. Knight and ▮▮▮ had a Facebook Messenger call, and immediately afterwards, Knight talked about avoiding getting into trouble:

    a.   Knight: "You know, messages (including pictures) are encrypted."

    b.   ▮▮▮ : "Did not"

    c.   Knight: "There's no way anyone would know a thing."

    d.   ▮▮▮ : "How do people get caught then?"

    e.   Knight: "Loose lips sink ships"

    f.   ▮▮▮ : "Huh"

    g.   Knight: "People talking to people"

    h.   ▮▮▮ : "What's a pen trace or something like that?"

    i.   ▮▮▮ : "Pen tap trace?"

    j.   Knight: "Something that someone would need a warrant to obtain. A warrant would be issued because someone said something."

    k.   Knight: "It goes back to people talking to people"

    l.   ▮▮▮ : "That's how they caught bf" (AGENT'S NOTE: It is believed here that ▮▮▮ is referring to ▮▮▮ .)

    m.   ▮▮▮ : "20 years ago"

    n.   Knight: "Someone said something to someone"

    o.   ▮▮▮ : "The cop"

    p.   Knight: "That was child porn though, this isn't."

    q.   ▮▮▮ : "True"

r. Knight later asked for more bra pictures of V1. ███ sent three clothed images of V1 and two pictures of V3. Knight commented on V3's pictures by saying, "Damn she's cute too". Knight asked for more pictures of the girls in "skimpy stuff".

82. On April 6, 2021, Knight told ███ to have V1 call him "via video in a bra! lol" "or from the shower lol".

83. On April 18, 2021, ███ sent Knight a clothed image of V1. Knight asked if V1 could unbutton her shirt or, "Just no shirt at all lol".

84. On April 27, 2021, Knight asked ███ for a picture of V3 changing her shirt.

85. Between May 2 through 4, 2021, Knight sent ███ several screenshots of lingerie and asked if V1 or V3 would wear the items. ███ indicated that the girls would wear the lingerie and stated, "They can share." Knight asked for ███'s shipping address, and ███ provided "XXXXX (redacted), ███ VA ███". Knight responded, "ordered".

86. Between May 5, 2021 and November 17, 2021, communications between Knight and ███ become infrequent. Knight "unsent" numerous messages, although he continued to ask ███ for pictures of the girls.

**Review of Other Knight Facebook Messages**

87. Your Affiant reviewed other Facebook Messages in Knight's account and located several where Knight sent other users suspected child sexual abuse material.

88. On March 18, 2020, while conversing with "G.P." (redacted) (Facebook ID: XXXXXXX75780070 (redacted)), Knight stated that he liked to "watch younger girl's fuck" and "watching young girls masturbate". Knight stated that it was possible that he had seen something depicting a girl who wasn't 18, who was 16 or 17, although the pornography website said the girl

was 18. Knight stated, "Yeah, some of these girls look younger than 18. Do you wanna see one?" Knight then sent a video of an apparent teenaged girl, nude, masturbating. Immediately after sending the video, Knight said, "Like that girl is probably 15 or 16. What do you think?" G.P. agreed that the girl looked younger than 18. Knight stated the video was on "PornHub" and asked if G.P. thought it was "hot". He also asked, "Yeah, you think 15 or 16 is ok to look at and you think it's sexy?" Knight later stated, "It is about fantasy and I just like looking at younger girls pussies". Knight then asked how old G.P.'s daughters were and if they were pretty.

    a. On March 19, 2020, Knight told G.P. he was "sitting here watching young porn, wyd". Knight asked if he could show G.P. a girl and have G.P. tell him how old the girl is. G.P. agreed and Knight sent a video of himself masturbating to a video on his computer, which appeared to be a Macbook style laptop. The video depicted an apparent teenaged nude female masturbating. G.P. responds that the girl looked 14 or 15. Knight responded, "Dammit", "Why is it gonna make ME cum", and "There's something wrong with me", and "Well do you wanna watch me cum to it". G.P. said there was nothing wrong with him, that he just likes "the look of a young pussy". Knight responded, "I do".

    b. On March 22, 2020, Knight sent four videos to G.P. which depicted nude apparently teenaged girls masturbating. Knight asked G.P. how old she thought the girls in the videos were. G.P. stated she thought the girls depicted in the videos were "Probably 15 or 16 for all". Knight responded that he thought one of the girls in the videos "might be 13 or 14". Knight later stated, "It's bad that I want a taste of it isn't it", "I mean of the 14 yo pussy", "I want to taste it", "And I think that might be bad." He then stated, "Like I legitimately wanna taste and

43

finger a 14 or 15 yo pussy", "And I'm pretty sure that's a bad idea and bad of me", "I'm a bad person for wanting that." He later continued, "I just wanna taste a young pussy and see what it's like." Knight also stated, "The thing is, if some girl that was 14 or 15 told me to eat her pussy and I knew her parents were ok with it, I'd totally do it." Knight then references the girl in the video above and stated he would "do it" with her. Knight continued by saying that he would "never coerce anyone into anything, but if that exact scenario presented itself, saying no would be really hard." Knight stated he would feel guilty after the fact, "and would probably feel guilty immediately spraying with a younger girl in the face with my cum. But during the act would feel so good."

89.    On February 28, 2021, while conversing with "T.A." (redacted) (Facebook ID: XXXXXXX60026482) (redacted), Knight sent twelve images that each contained nude females that appeared to be teenaged. Some of the images depicted the females masturbating. The focal point of all of the images were the nude breasts and/or genitals of the females.

90.    On April 14, 2021, while conversing with "P.H." (redacted) (Facebook ID: XXXXXXX89831753), Knight sent multiple videos of pornography, some of which depicted suspected child sexual abuse material. Before sending one of the videos, Knight said, "A teen masturbating with a hairbrush to a creamy cum orgasm". Knight then sends a video that depicts an apparent teenaged female, nude, masturbating with a hairbrush.

    a.    Knight then sent a video of an apparent teenaged female exposing and spreading her vagina. Immediately after sending the video, Knight said, "^teen pussy^".

b.  On April 18, 2021, Knight sent ████████ nine images of nude females that appeared to be teenagers. The focal point of all of the images were the nude breasts, buttocks, and/or

44

genitals of the females. One of the images depicted a female masturbating and another image depicted two nude females kissing. After sending these images, Knight said, "Hot pussies".

### c. Other Information Obtained from the Facebook Records

91.     Many of the videos that Knight sent to ███ depicted a Macbook style laptop with a video playing on the laptop's screen as the focal point of the video. Accordingly, it is believed that Knight used a cell phone or other video-recording device to record the videos. In many of the videos, a male, believed to be Knight, can be seen masturbating to the video that is playing on the laptop.

92.     The Facebook records include a section entitled "mobile_devices", which contains "Information about the account holders device." Your Affiant reviewed this section of the Facebook records and found that two mobile devices were connected to Knight's Facebook account: an iPhone and an iPad.

93.     The Facebook records contain location history associated with the account holder's device. The last location provided by the records, on January 31, 2022 were GPS coordinates latitude 38.040557861328 and longitude -84.483184814453. Your Affiant looked up these coordinates in Google Maps and it resolved to 607 Boonesboro Avenue, Lexington, KY 40508. Many of the other locations provided were very similar coordinates.

94.     On January 29, 2022, Knight told "L.M." (redacted) (Facebook ID: XXXXX0471) (redacted) that he has "younger kids… 3 (daughter Z. (redacted)) and almost 10 (son M. (redacted))."

95.     On May 9, 2021, Knight told "E.T." (redacted) (Facebook ID: XXXXXXX92374518), "I've been occupying the second floor of my mom's since the pandemic

started". Knight also told her, "I'm near Ashland actually, near Magees" and "Boonesboro Ave, Bell Ct neighborhood."

96.    Your Affiant obtained Knight's Kentucky driver's license information, which has 607 Boonesboro Avenue, Lexington, KY 40508 listed as his address. Your Affiant also obtained records of Knight's registered vehicles, which listed a 2010 Honda Civic (KY License Plate 5112HG), registered to Knight at the same address.

97.    Based upon Knight's Facebook records, it appears that his mother is "Mary Knight" (Facebook ID: XXXXXXXX7242656) (redacted). Your Affiant obtained Edna Mary Knight's Kentucky driver's license information, which lists 607 Boonesboro Avenue, Lexington, KY 40508 as her address. Your Affiant also obtained records of Mary Knight's registered vehicles, which lists a 2015 Subaru Outback registered to her at the same address.

98.    Your Affiant obtained employment records for Knight. As of December 2021 and January 2022, Knight was collecting unemployment benefits with a listed address of 607 Boonesboro Avenue, Lexington, KY 40508.

99.    On March 12, 2022, Your Affiant observed Knight's Honda Civic parked in the driveway at 607 Boonesboro Avenue, Lexington, KY 40508.

100.    As indicated above, based on my training and experience, individuals who have an intent to entice, distribute, receive and collect child pornography, will use on-line mobile applications, like Facebook, to communicate with, send and obtain images and videos of child sexual abuse material, from other adults and even minors.  A third-party application, like the Facebook application, can be accessed from a mobile device such as a smart phone, tablet, laptop or computer, through which individuals like Zachary Knight can send, receive or store child

sexual abuse material, and easily communicate with others at any time and in any location where the device is accessible to the internet or a cellular connection.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

101.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

102.    *Probable cause.*  I submit that if a smart phone, tablet, computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that smart phone, tablet, computer or storage medium, for at least the following reasons:

    a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and

47

virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

    d.    Similarly, files that have been viewed via the Internet / cellular connection are sometimes automatically downloaded into a temporary Internet directory or "cache."

103.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

    e.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified for nefarious reasons by a subject.

    f.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session

48

times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

104.    *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the

warrant. In lieu of removing storage media from the premises, it is sometimes possible to make

an image copy of storage media.  Generally speaking, imaging is the taking of a complete

electronic picture of the computer's data, including all hidden sectors and deleted files.  Either

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

on the storage media, and to prevent the loss of the data either from accidental or intentional

destruction.  This is true because of the following:

     a.   The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

     b.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

     c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

105.   *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

storage media that reasonably appear to contain some or all of the evidence described in the

warrant and would authorize a later review of the media or information consistent with the

warrant.  The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection to determine whether it is evidence described by the warrant.

106.   Because several people may share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well. If determination can be determined on-site as to the true ownership of a particular storage media, that item will not be seized.

107.   *Biometric Access to Devices*   This warrant permits law enforcement to compel any person(s), including Knight and any residents or overnight guests for whom there is reasonable suspicion to believe have committed a criminal violation that is the subject matter of this search warrant, and who may have had ownership, custody or control over electronic devices found within the PREMISES, to provide biometric access to unlock any devices subject to seizure pursuant to this warrant.  Examples of devices for which there is reasonable suspicion that Knight's, residents' or any overnight guests' biometrics will unlock the devices are those electronic devices located on such person, in near proximity to them (such as in the nightstand in their bedroom, or located on a kitchen or dining table near that person while that person is eating a meal), or in a place that is reasonably associated with such person at the time of the execution of the requested search warrant.  The grounds for this request are as follows:

a.   I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic

devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

52

d.      If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.      As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices may be found during the search.  The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.      Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of any person against whom there is reasonable suspicion to believe they committed a criminal violation and had ownership, custody or control of the devices to the fingerprint scanner of the devices found at the PREMISES; (2) hold the devices found at the PREMISES in front of the face of any person against whom there is reasonable suspicion to believe that they committed a criminal violation and had ownership, custody or control of the device found at the PREMISES and activate the facial recognition feature; and/or (3) hold the devices found

54

at the PREMISES in front of the face of any person against whom there is reasonable suspicion to believe they committed a criminal violation and had ownership, custody or control of the device found at the PREMISES and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that any individual at the PREMISES state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel any individual at the PREMISES to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

108.    Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that there has been a violation of Title 18, United States Code, §§ 2422(b), 2251(a), 2252(a)(2), and 2252(a)(4)(B), which prohibits the enticement of minors, as well as producing, advertising, promoting, presenting, distributing, possessing, or accessing with the intent to view, using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, child pornography/child sexual abuse material, and that evidence of those violations exist and are located at the PREMISES described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING

109.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation.  Accordingly, there is good cause to seal these documents

because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/ Jeffrey Tyler Chelf

Jeffrey Tyler Chelf, Task Force Officer
Federal Bureau of Investigation

Transmitted via email and attested to by the applicant by telephone in accordance with the requirements of
Fed. R. Crim. P. 4.1 on this __15__ day of March, 2022.

Hon. Matthew A. Stinnett
UNITED STATES MAGISTRATE JUDGE

56

## ATTACHMENT A
## PROPERTY TO BE SEARCHED

This warrant applies to information associated with 607 Boonesboro Avenue, Lexington, Kentucky 40508, Fayette County and all outbuildings on the property (hereinafter referred to as the "PREMISES"), the person of Zachary Knight (hereinafter "PERSON"), and Zachary Knight's 2010 Honda Civic (hereinafter "VEHICLE").

607 Boonesboro Avenue, Lexington, Kentucky 40508 is further described as a two-story, single-family dwelling located on Boonesboro Avenue between Bell Place and East Bell Court. The dwelling has red brick and brown shingles. The dwelling has a detached garage on the rear of the property. The numbers "607" are affixed to the awning over the front porch above the front door. There are two white columns on the front porch and a concrete sidewalk leads from the sidewalk near the street to the front door.

The person of Zachary Albert Knight, a white male with date of birth July 24, 1979, see attached DMV photograph.

Zachary Knight's 2010 Honda Civic (silver), KY License Plate 5112HJ, see attached photograph.

57



Zachary Knight – Kentucky Driver's License Photograph





607 Boonesboro Avenue, Lexington, KY 40508
(Taken from the Fayette County Property Value Administrator's Website)



Zachary Knight's 2010 Honda Civic (Picture Taken from Google Maps)

59

## ATTACHMENT B
## PARTICULAR THINGS TO BE SEIZED

1.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the communication between Knight and minors, or Knight and others regarding the sexual exploitation of children, enticement of minors, or the production, receipt, distribution, or possession of child sexual exploitation images.

2.      In any format and medium, all originals, computer files, copies, and negatives of images of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

3.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

4.      Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

5.       Any and all cameras, film, videotapes or other photographic equipment.

6.    Any and all visual depictions of minors.

7.    Any and all diaries, notebooks, notes, and any other records reflecting personal

contact and any other activities with minors visually depicted while engaged in sexually explicit

conduct, as defined in 18 U.S.C. § 2256(2).

8.    Records evidencing occupancy of the premises described above, including, but

not limited to, utility and telephone bills, mail envelopes, or addressed correspondence.

9.    Records or other items which evidence ownership or use of computer equipment

found in the above PREMISES and VEHICLE, including, but not limited to, sales receipts, bills

for Internet access, and handwritten notes.

10.    Computers, electronic devices, smart devices, or storage media used as a means to

commit the violations described above from the dates of April 4, 2020 to January 31, 2022.

11.    For any computer, electronic device, smart device, or storage medium whose seizure is

otherwise authorized by this warrant, and any computer, electronic device, smart device, or

storage medium that contains or in which is stored records or information that is otherwise called

for by this warrant (hereinafter, "COMPUTER"):

  a.    evidence directly on the COMPUTER or physically located in the PREMISES of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted; such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, installed and deleted/uninstalled apps, search keyword or phrases, photographs, videos, and correspondence;

  b.    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

  c.    evidence of the lack of such malicious software;

      d.     evidence indicating how and when the COMPUTER was accessed or used to determine the chronological context of COMPUTER access, use, and events relating to crime under investigation and to the COMPUTER user.

      e.     evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

      f.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

      g.     passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

      h.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

      i.     records of or information about Internet Protocol addresses used by the COMPUTER;

      j.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, downloaded and uninstalled applications, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12.    Routers, modems, and network equipment used to connect COMPUTERS to the Internet.

13.    Any physical item related to or used to further the sexual exploitation of children, including clothing, lingerie, sexual devices, etc.; and any information, documents, records, or correspondence, in any format and medium, related to the purchase of and payment for physical items related to the sexual exploitation of children.

14.    As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks, thumb drives, SD Cards, external hard drives, or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

15.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, laptops, mobile phones, smart phones, smart devices, gaming devices, tablets, server computers, and network hardware.

16.     The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, thumb drives, flash drives, external hard drives, SD Cards, microSD Cards, and other magnetic or optical media.

17.     This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, technical experts.

18.     During the execution of the search of the PREMISES described herein, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual located at the PREMISES for whom there is reasonable suspicion to believe has committed a criminal violation that is the subject matter of this search warrant, and reasonable suspicion that those individuals had ownership, custody or control over electronic devices found within the SUBJECT PREMISES, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original        ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Kentucky

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>607 Boonesboro Avenue, Lexington, Kentucky 40508,<br>2010 Honda Civic, KY License Plate 5112HJ, Zachary<br>Knight DOB: 7/24/79 (See Attachment A,B) | )<br>)<br>)    Case No.  22-MJ-5106-MAS<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Kentucky_____
*(identify the person or describe the property to be searched and give its location)*:

607 Boonesboro Avenue, Lexington, Kentucky 40508; 2010 Honda Civic (silver), KY License Plate 5112HJ; Zachary Albert Knight DOB: 7/24/79 (See Attachment A, B for full description)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

property that constitutes evidence of the commission of a crime; property designed or intended to be used as the means of committing a criminal offense.  (See Attachment B, which is attached and made a part hereof )

**YOU ARE COMMANDED** to execute this warrant on or before _____March 29, 2022_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Matthew A. Stinnett_____.
                                                                                *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   **5:09 PM, Mar 15, 2022**          _____
                                                                                            *Judge's signature*

City and state:   Lexington, Kentucky                          Matthew A. Stinnett, United States Magistrate Judge
                                                                                            *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>22-MJ-5106-MAS | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** | | |
|---|---|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*